UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | |
|---|---|
| GREGORY JOHNSON, | ) |
| | ) |
|    Plaintiff, | ) |
| | ) |
|    vs. | ) CAUSE NO. 1:12-cv-1582-WTL-DML |
| | ) |
| CHRYSLER GROUP, LLC, | ) |
| | ) |
|    Defendant. | ) |

**ENTRY ON DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

This cause is before the Court on the Defendant's motion for summary judgment (dkt. no. 40). The motion is fully briefed, and the Court, being duly advised, **DENIES** the motion for the reasons set forth below.

## I.    STANDARD

Federal Rule of Civil Procedure 56(a) provides that summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." In ruling on a motion for summary judgment, the admissible evidence presented by the non-moving party must be believed and all reasonable inferences must be drawn in the non-movant's favor. *Hemsworth v. Quotesmith.com, Inc.*, 476 F.3d 487, 490 (7th Cir. 2007); *Zerante v. DeLuca*, 555 F.3d 582, 584 (7th Cir. 2009) ("We view the record in the light most favorable to the nonmoving party and draw all reasonable inferences in that party's favor."). However, "[a] party who bears the burden of proof on a particular issue may not rest on its pleadings, but must affirmatively demonstrate, by specific factual allegations, that there is a genuine issue of material fact that requires trial." *Id.* Finally, the non-moving party bears the burden of specifically identifying the relevant evidence of record, and "the court is not

required to scour the record in search of evidence to defeat a motion for summary judgment." *Ritchie v. Glidden Co.*, 242 F.3d 713, 723 (7th Cir. 2001).

## II. BACKGROUND

The facts that follow are those taken in the light most favorable to the Plaintiff, Gregory Johnson.

Mr. Johnson began working for Chrysler Group, LLC ("Chrysler") in its Kokomo Transmission Plant ("KTP") on June 28, 1999, as a maintenance supervisor. During his tenure with Chrysler, Mr. Johnson worked on the second shift, from 3:00 p.m. to 11:00 p.m. During the relevant time period, Mr. Johnson's immediate supervisor was Area Manager Marsha McCorkle. Ms. McCorkle worked first shift, from 7:00 a.m. to 3:00 p.m.; as a result, second-shift Operations Manager Jeffrey Jones shared responsibility for supervising Mr. Johnson and the other maintenance supervisors, including those who worked third shift from 11:00 p.m. to 7:00 a.m.

Because Chrysler had different maintenance supervisors for each of the three different shifts, it had two official "carryover meetings"—one at 6:30 a.m. and the other at 2:30 p.m. These meetings were held for the benefit of the maintenance supervisors in order to update them on what happened during the previous shift, inform them of what equipment was broken, tell them about any safety issues, etc. Mr. Johnson was expected to arrive to work at 2:30 p.m. to attend this meeting. While there was no official carryover meeting between second and third shift, Mr. Johnson, as an outgoing supervisor, was required to handle the transition and inform the incoming supervisor of the pertinent information at the end of his shift.

As a maintenance supervisor, Mr. Johnson was required to work forty hours per week and received a flat rate of pay every two weeks. Maintenance supervisors were not required to

officially track their time unless they deviated significantly from the required forty-hour workweek. When that occurred, they were to document their time in Chrysler's electronic timekeeping system. Maintenance supervisors had no designated departure time; they were simply expected to work their shift, complete any necessary paperwork, and then communicate the pertinent information to the incoming supervisor. In fact, Mr. Johnson was told that he could leave as soon as he debriefed his replacement. Thus, when the incoming supervisor for the third shift would arrive, even if it was before 11:00 p.m., Mr. Johnson would meet with him and then leave work. No one complained or disciplined Mr. Johnson for this practice until the last year of his eleven years of employment with Chrysler.

In 2004, unfortunately, Mr. Johnson was severely injured in a four-wheeler accident. As a result of his injuries, Mr. Johnson was unable to work from June 2004 through July 2005. Mr. Johnson took medical leave for this time and also received disability benefits; he returned to work at Chrysler's KTP around July 2005.

After his accident, Mr. Johnson began to suffer from sporadic dizzy spells. In 2011, doctors diagnosed his condition as Meniere's disease.[1] At times, Mr. Johnson's dizzy spells were so intense that he had to leave work early. When this occurred, Mr. Johnson would inform Ms. McCorkle, who was aware of his diagnosis, of his need to leave; she would allow him to leave, simply saying, "Okay, Greg, take care of yourself." Mr. Johnson did not otherwise document his absences.

---

[1] "Meniere's disease is a disorder of the inner ear that causes spontaneous episodes of vertigo—a sensation of a spinning motion—along with fluctuating hearing loss, ringing in the ear (tinnitus), and sometimes a feeling of fullness or pressure in your ear." http://www.mayoclinic.org/diseases-conditions/menieres-disease/basics/definition/con-20028251 (last visited July 14, 2014).

By October 2011, Mr. Johnson's condition had worsened.  He informed Ms. McCorkle that he was interested in requesting leave under the Family Medical Leave Act ("FMLA"), and she referred him to Chrysler's Human Resources ("HR") department.  Thus, sometime before October 26, 2011, he obtained the pertinent forms from the office of Barry Linkogle, Chrysler's Talent Management Specialist.  Mr. Johnson's treating physician signed the forms on October 26, 2011, requesting FMLA leave for Mr. Johnson from October 26, 2011, through November 2, 2011.  Chrysler approved his request, as well as another request in January 2012.

Around this time, in late October 2011, someone informed Mr. Linkogle that Mr. Johnson was leaving early, prior to the end of his shift.  As a result, Chrysler opened an investigation into Mr. Johnson's work absences.  Mr. Linkogle requested a gate ring report for Mr. Johnson that would show when he swiped his badge to enter and exit the plant.  This report was generated on October 26, 2011, and revealed that since April 1, 2010, Mr. Johnson had been paid for 88.25 hours more than he had worked.  This report did not account for any of the time Mr. Johnson left Chrysler's KTP for medical reasons or his paid lunch time.  Also around this same time, specifically on November 1, 2011, Mr. Jones sent an email to Mr. Linkogle noting that Mr. Johnson "has been somewhat M.I.A. for the last three days.  Either by not coming to work (call-in) or showing up only to leave shortly thereafter, not capable of working an 8 hour shift." Dkt. No. 46-9.

Mr. Johnson was informed of this investigation on November 7, 2011.  It was only at this time that Ms. McCorkle specifically informed him that he needed to work until 11:00 p.m.  Mr. Johnson did so until his termination.

As a result of the investigation, Mr. Linkogle recommended that Mr. Johnson's employment be terminated for violating the Chrysler's Standards of Conduct.  Thus, Mr. Johnson

was terminated on March 30, 2012. His termination letter, signed by Mr. Linkogle, noted the decision was made because: he was "absent or tardy on multiple occasions without excuse"; he "left [his] workstation or the plant during working hours without permission"; and he "failed to return to work after lunch without permission." Dkt. No. 46-4. The letter also referenced his 2010 and 2011 Performance and Leadership Management reviews in which Mr. Johnson received an overall leadership rating of "low."

Mr. Johnson filed a charge of discrimination with the Equal Employment Opportunity Commission ("EEOC") on May 8, 2012, alleging that Chrysler had discriminated against him based on his disability. Mr. Johnson received his right to sue notice from the EEOC on or about July 30, 2012, and he filed this suit on October 26, 2012.

### III. DISCUSSION

Mr. Johnson brings two claims against Chrysler: 1) a claim under the Americans with Disabilities Act ("ADA"); and 2) a claim pursuant to the FMLA. Chrysler moves for summary judgment on both claims. Its arguments will be addressed, in turn, below.

As an initial matter, the Court notes that Mr. Johnson addressed his ADA claim and his FMLA claim together in his brief. While the Court recognizes that his two claims are intertwined—Mr. Johnson likely would not have requested FMLA leave had he not been suffering from a health issue—Chrysler correctly notes that the burdens are different under the separate statutes. Under the ADA, Mr. Johnson has to show that *but for* his disability, he would not have been fired. *See Serwatka v. Rockwell Automation, Inc.*, 591 F.3d 957, 962 (7th Cir. 2010) (noting that the ADA "demands proof that a forbidden consideration—here, the employee's perceived disability—was a 'but for' cause of the adverse action complained of"). On the other hand, in order to succeed on his FMLA claim, Mr. Johnson need only show "that

5

the protected conduct was a substantial or motivating factor in the employer's decision." *Goelzer v. Sheboygan County, Wis.*, 604 F.3d 987, 995 (7th Cir. 2010) (internal quotation marks omitted). With this in mind, the Court turns to each of Mr. Johnson's claims, analyzing them separately but recognizing that there is substantial factual overlap.

### A. Mr. Johnson's ADA Claim[2]

"The ADA prohibits employers from discriminating against disabled employees because of their disability." *Dickerson v. Bd. of Trustees of Cmty. Coll. Dist. No. 522*, 657 F.3d 595, 600 (7th Cir. 2011) (citing 42 U.S.C. § 12112(a)). It is well-established that "[a] party alleging discrimination under the ADA . . . may proceed under the direct or indirect method of proof and may rely on circumstantial evidence to meet his burden." *Teruggi v. CIT Grp./Capital Fin., Inc.*, 709 F.3d 654, 659 (7th Cir. 2013). Mr. Johnson has chosen to proceed under the direct method of proof. Thus, in order to survive Chrysler's motion for summary judgment,

> he must offer evidence from which an inference of discriminatory intent can be drawn, such as: (1) suspicious timing; (2) ambiguous statements or behavior towards other employees in the protected group; (3) evidence, statistical or otherwise, that similarly situated employees outside of the protected group systematically receive better treatment; and (4) evidence that the employer offered a pretextual reason for an adverse employment action.

*Teruggi*, 709 F.3d at 659-60 (internal quotation marks omitted). "A party may combine these various types of evidence to present a convincing mosaic of circumstantial evidence from which a factfinder can make a reasonable inference of discriminatory intent." *Id*. at 660 (internal quotation marks omitted). Mr. Johnson relies on two of the above: suspicious timing and pretext.

---

[2] For summary judgment purposes, Chrysler does not dispute that Mr. Johnson qualifies as "disabled" under the ADA.

6

With regard to suspicious timing, Mr. Johnson argues that his Meniere's disease was worsening in late October 2011, so bad, in fact, that he informed Ms. McCorkle that he was interested in taking FMLA leave around this same time. He obtained the pertinent paperwork from HR sometime before October 26, 2011—the date his physician signed the paperwork. Also around this time someone[3] complained to Mr. Linkogle about Mr. Johnson's work absences, and the gate ring report was run on October 26, 2011. *See* dkt. no. 46-12. On November 1, 2011, Mr. Jones wrote an email to HR complaining that Mr. Johnson was not capable of working a full eight-hour shift.

Based on all of these events that happened around the same time, the Court agrees with Mr. Johnson that a reasonable jury could find the timing to be suspicious, leading it to question whether Chrysler chose to investigate Mr. Johnson's work absences in late October 2011 due to his Meniere's disease. Chrysler makes much about the fact that it knew about Mr. Johnson's condition "for years," specifically, since he first began experiencing symptoms in 2007, but argues that it did not terminate him until 2012. This is not entirely accurate and misses the mark. While it may have been obvious to Chrysler that Mr. Johnson was experiencing some type of health condition, it was not until late October 2011 that Mr. Johnson informed Ms. McCorkle that he had been diagnosed with Meniere's disease:

> A: Again, this [when Ms. McCorkle found out about Mr. Johnson's diagnosis] is all right around the exact same time. There's not a big differentiation in time.
>
> …

---

[3] Mr. Linkogle surmises that Mr. Jones or Ms. McCorkle made this communication. *See* Linkogle Dep. 31: 17-22. Mr. Jones, however, does not recall making any communications with Mr. Linkogle prior to his November 1, 2011, email. *See* Jones Dep. 19: 15-25. Similarly, Ms. McCorkle does not know why the investigation was started. *See* McCorkle Dep. 47: 23-25.

7

> Q: Do you remember if Greg's absences from work were becoming more frequent due to medical—
>
> A: Yes.
>
> Q: —condition
>
> A: They were.
>
> Q: Okay. And that was prior to the November investigation?
>
> A: Roughly that time period, yes.

McCorkle Dep. 58: 14-25. Thus, around the same time Mr. Johnson was diagnosed with Meniere's disease and had to request FMLA leave due to the severity of his condition, an investigation into his absences was conducted that led to his eventual termination. Viewing the facts in the light most favorable to Mr. Johnson, the Court concludes that a reasonable jury could find the timing to be suspicious.

The Court turns now to Mr. Johnson's pretext argument. The Seventh Circuit has noted that "a party establishes pretext with evidence that the employer's stated reason or the employment decision 'was a lie—not just an error, oddity, or oversight.'" *Teruggi*, 709 F.3d at 661 (quoting *Van Antwerp v. City of Peoria, Ill.*, 627 F.3d 295, 298 (7th Cir. 2010)). Mr. Johnson "may demonstrate pretext directly by showing that a discriminatory reason more likely motivated his termination, or indirectly by showing that [Chrysler's] explanations are unworthy of credence." *Senske v. Sybase, Inc.*, 588 F.3d 501, 507 (7th Cir. 2009) (internal quotation marks omitted). The reasons Chrysler gave for terminating Mr. Johnson's employment were as follow: he was "absent or tardy on multiple occasions without excuse"; he "left [his] workstation or the plant during working hours without permission"; and he "failed to return to work after lunch without permission." Dkt. No. 46-4.

With regard to the first two reasons, Mr. Linkogle noted they referred to "leaving early, out of the plant." Linkogle Dep. 57: 19-21. Mr. Johnson admitted to this conduct:

> Q: But you did – you do admit that you routinely left before 11, the end of your shift?
>
> A: Before – yeah, before 11, yeah, after my follow-up.
>
> Q: And when you routinely left before 11 p.m., you did not get permission to do that, you just left?
>
> A: Yes.

Johnson's Dep. 102: 8-15. Based on this admission, Chrysler argues that Mr. Johnson cannot show pretext. The Court disagrees.

Mr. Johnson had been leaving work after his unofficial carryover meeting with the incoming maintenance supervisor for eleven years. He was told when he first started working for Chrysler that he was allowed to leave after he performed his carryover duties with the incoming supervisor:

> Q: So you did not have the understanding that you were expected to work through the end of your shift.
>
> A: No. We were told to work our follow-ups, work it out. And that's the way we've done it for my entire career there. . . . I always came in a half hour early, but I never stayed a half hour over, and I don't know anybody that did.

*Id*. 58: 4-18. A reasonable jury could, therefore, question Chrysler's true motives in investigating Mr. Johnson, and eventually terminating him, for a practice he had maintained for eleven years. This is compounded by the fact that Chrysler admits it had no official departure time for its maintenance supervisors. While Chrysler claims it was its expectation that Mr. Johnson work through his entire shift, this was not directly communicated to Mr. Johnson until the November 7, 2011, meeting, nor was it contained in any official policy:

9

> Q: And you did not understand that it was your obligation as a supervisor to work to the end of your shift?
>
> A: No, I didn't—I didn't really understand that, because Larry King told us to work our follow-ups out between us, so for 11 years I had been getting a follow-up when the third shift guy got there and then I would leave, but we didn't have the half hour early back then.
>
> …
>
> A: Yeah, I thought it was okay to leave because my guys were in the shower, I wasn't giving nobody else a job. It was a shift change.

*Id.* 84: 22 – 86: 23. When Chrysler did clearly communicate the workday expectation to Mr. Johnson at the November 7, 2011, meeting, he worked until 11:00 p.m. until he was terminated. *See Id.* 103: 19-24.

With regard to the last reason given for Mr. Johnson's termination, Mr. Linkogle surmised that it referred to "occasions when he stayed—when he didn't—when he was out of the plant for more than 30 minutes. Or I don't know if there was occasions [sic] where he did leave at lunch and never came back after lunch without permission." Linkogle Dep. 58: 18-22. Again, the Court believes that a jury could question this reason, as there appears to be much confusion over Chrysler's lunch break policy. Both Mr. Johnson and Mr. Jones believed the lunch break was a paid break. *See* Johnson Dep. 158: 4-5; Jones Dep. 35: 2-4. Ms. McCorkle claimed she did not know what the policy on lunches was. *See* McCorkle Dep. 27:12-14. Mr. Linkogle, however, believed it was an unpaid lunch break. *See* Linkogle Dep. 27: 1. A jury could very well find it to be disingenuous to count the entire time Mr. Johnson was on his lunch break as an absence—not just the alleged "extra" lunch time he took—given the clear confusion on the lunch break policy.

Chrysler argues that simply because Mr. Johnson believes it was mistaken in its calculation of the number of hours for which Mr. Johnson was absent does not show pretext. A

jury could agree and find that Chrysler simply made an honest mistake in its calculation, concluding that no discriminatory animus was behind its investigation and eventual termination of Mr. Johnson. However, when combined with the fact that the investigation into Mr. Johnson's absences occurred immediately after his health condition worsened and he applied for leave under the FMLA, and that he was being investigated for a practice that he had followed consistently since 1999, a reasonable jury could also concluded that the "mistakes" were no mistakes at all, but rather an attempt to make Mr. Johnson's attendance record look worse, giving it more reason to terminate him.

Finally, as Mr. Johnson notes, while Chrysler's main concern with him was the fact that he was leaving before 11:00 p.m., in its calculation of the hours that Mr. Johnson got paid for but did not work, *see* dkt. no. 46-6, it included the time when he left work early, *with permission* from Ms. McCorkle, due to his Meniere's disease. Given the fact that by the time the November 7, 2011, meeting was held, Mr. Linkogle and Ms. McCorkle were aware of Mr. Johnson's Meniere's disease and request for FMLA leave, a jury could also find it disingenuous to count these hours against him.

In all, the Court finds that Mr. Johnson has produced sufficient evidence to present a convincing mosaic of circumstantial evidence from which a jury could make a reasonable inference of discriminatory intent. Accordingly, summary judgment is **DENIED** on Mr. Johnson's ADA claim.

### B. Mr. Johnson's FMLA Claim

Mr. Johnson also brings a claim pursuant to the FMLA. As an initial matter, there is some dispute as to what type of FMLA claim Mr. Johnson pled in his Complaint. Chrysler argues that Mr. Johnson pled an interference claim, not a retaliation claim, and argues that he

cannot prove his interference claim because it granted the FMLA leave he sought.  Further, it argues that because Mr. Johnson did not use the word "retaliation" in his Complaint, he did not plead a retaliation claim, and he is now foreclosed from asserting that claim at the summary judgment phase. The Court disagrees.

First, it is well-established that "plaintiffs in federal court are not required to plead with precision legal theories or detailed facts." *Benuzzi v. Bd. of Educ. of City of Chicago*, 647 F.3d 652, 664 (7th Cir. 2011).  Thus, simply because Mr. Jones did not use the word "retaliation" does not mean that his Complaint cannot be read to allege as such.  Further, 29 C.F.R. § 825.220(c) states that the FMLA's "prohibition against 'interference' prohibits an employer from discriminating or retaliating against an employee . . . for having exercised or attempted to exercise FMLA rights."  It is clear, therefore, that interference claims can be broad enough to encompass what Mr. Johnson alleges:  that Chrysler's investigation, and eventual termination, were in retaliation for his request for leave pursuant to the FMLA. *See* Pl.'s Complaint ¶ 31 ("Chrysler willfully and intentionally interfered with Johnson's ability to take FMLA leave by launching an unjustified investigation after he applied for leave and terminating him after he renewed his request for leave.").  The Court thus turns to the parties' arguments.

Once again, Mr. Johnson chooses to proceed under the direct method and, therefore, he "survives summary judgment by creating a triable issue of whether the adverse employment action of which []he complains had a discriminatory motivation." *Shaffer v. Am. Med. Ass'n*, 662 F.3d 439, 444 (7th Cir. 2011).  Mr. Johnson advances the same arguments as above—suspicious timing and pretext.  The Court will address his suspicious timing argument first.

The analysis with regard to his suspicious timing argument is the same as applies to his ADA claim.  Mr. Johnson argues that his "initiation of the process for requesting FMLA leave

was the reason for the investigation." Pl.'s Response at 27.  The Court agrees that this is a reasonable inference that a jury could make.  Even Mr. Linkogle himself noted that "[t]he dates were all very close." Linkogle Dep. 43: 22.  Chrysler argues that "there is no evidence that Linkogle was aware that Johnson intended to request FMLA leave—much less that he needed FMLA leave—when he initiated his investigation." Def. Reply at 10.  The Court disagrees.

> Mr. Linkogle said the following about his knowledge of Mr. Johnson's FMLA request:
>
> And when he requested this paperwork, she [Dana Miller] may or may not have told me, hey, Greg Johnson requested FMLA paperwork, as she would any employee, she may communicate that.  Because we don't get that many requests from salaried people.  So over a period of, from the time he requested it until the time he turned the paperwork in, I would have been aware that there was an FMLA request out there.

Linkogle Dep. 43 at 8-11.  Viewing this in the light most favorable to Mr. Johnson, a reasonable jury could conclude that Mr. Linkogle was aware of Mr. Johnson's FMLA request as of October 26, 2011, the date in which he ordered the gate ring report to be generated and officially began an investigation into Mr. Johnson's absences.

Finally, the Court turns to Mr. Johnson's arguments in support of pretext.  The arguments are the same as above, and thus the Court need not repeat the analysis in depth.  It is sufficient to say that Mr. Johnson has produced sufficient evidence from which a jury could conclude that Chrysler's reasons for terminating him are not worthy of credence.  The lack of clearly communicated official policies, Chrysler's calculation of the number of Mr. Johnson's "absences," and the suspicious timing of the investigation into Mr. Johnson for a practice he maintained for over eleven years might all give a jury pause.  In all, the Court finds that Mr. Johnson has produced sufficient evidence from which a jury could infer that his request for leave under the FMLA played a substantial role in Chrysler's investigation into his absences and his

eventual termination.  Accordingly, Chrysler's motion for summary judgment on Mr. Johnson's FMLA claim is **DENIED**.

## IV. CONCLUSION

For the foregoing reasons, the Defendant's motion for summary judgment (dkt. no. 40) is **DENIED**.  New trial and final pretrial dates will be set under separate order.

SO ORDERED: 07/15/2014

*William T. Lawrence*

Hon. William T. Lawrence, Judge
United States District Court
Southern District of Indiana

Copies to all counsel of record via electronic communication